**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

WORSHAM SPRINKLER COMPANY, INC.,
a Virginia corporation,

     Plaintiff,

v.                                         Civil Action No. 3:05cv494

WES WORSHAM FIRE PROTECTION, LLC,
a Virginia corporation, and
WESLEY WORSHAM, individually,

     Defendants.


**MEMORANDUM OPINION**

This matter is ripe for decision following a bench trial between Plaintiff, Worsham Sprinkler Company, and Defendants, Wes Worsham Fire Protection, LLC and Wesley Worsham, over a claim by Plaintiff that Defendants have infringed certain of Plaintiff's trademark, trade name, and service mark rights.  Under the Lanham Act (15 U.S.C. § 1051 et seq. (2004 Supp.)), Plaintiff seeks to permanently enjoin Defendants from using the trade name, Wes Worsham Fire Protection, LLC because it allegedly infringes upon Plaintiff's tradenames.[1]  The action was tried by the Court, sitting without a jury.  Having reviewed the exhibits and testimony of the witnesses, the Court makes the findings of fact and conclusions of law set forth below.

---

[1] Plaintiff has abandoned its claim for damages and attorneys' fees.

## BACKGROUND FACTS

Plaintiff, Worsham Sprinkler Company, is a Virginia corporation that provides sprinkler system design, installation, inspection, and repair services to general construction contractors and to building owners. Plaintiff currently is wholly owned by VSC Corporation ("VSC").

The Defendants[2] are Wes Worsham Fire Protection, LLC and Wesley Worsham, the company's majority shareholder. Wes Worsham Fire Protection, LLC provides the same services as Plaintiff, but only to construction contractors, and does not yet provide fire system maintenance and repair services to building owners. Unlike Plaintiff, Wes Worsham Fire Protection, LLC provides services only in Virginia. Therefore, in Virginia, the two companies are in essentially the same industry, compete for essentially the same customers, and use essentially the same pool of vendors.

In the 1960's, Wes Worsham founded Worsham Sprinkler Company in Mechanicsville, Virginia. The company subsequently enjoyed considerable success. In 1973, Philadelphia Suburban Corporation acquired Worsham Sprinkler Co. and Worsham Fire Protection Company, LLC, a subsidiary of Worsham Sprinkler Co. In the 1973 purchase agreement, Wes Worsham, who was then still the majority owner of

---

[2] This opinion will refer to Wes Worsham Fire Protection, LLC by name. When referring to the defendant Wesley Worsham, the opinion will use the name by which he is generally known, "Wes Worsham."

Worsham Sprinkler Co., certified that Worsham Sprinkler Co. had no registered trademarks or trade names. Wes Worsham remained employed by Worsham Sprinkler Co. by virtue of an Employment Agreement between him and Philadelphia Suburban Corporation in the 1973 purchase agreement. In fact, under the Employment Agreement,[3] Wes Worsham became the President and Chief Operating Officer of the acquired Worsham Sprinkler Co.

In 1978, Wes Worsham ceased working for Worsham Sprinkler Co. and began a new sprinkler business called Wes-Way Sprinkler Co. Eventually purchased by VSC, Wes-Way Sprinkler Co. employed Wes Worsham until 1999. After working for yet another fire protection company, Wes Worsham formed Wes Worsham Fire Protection, LLC in February 2005.

Meanwhile, Worsham Sprinkler Co. had changed hands several times and, in 2003, VSC purchased it. In that purchase, VSC, through a subsidiary, acquired the rights to the stylized, federally registered trademark, "WORSHAM SPRINKLER," which was first

---

[3] That agreement provides that Wes Worsham would not "own, manage, operate, join, control or participate in the ownership, management, operation or control of or be connected in any manner with any business under any name similar to the name of, or any name used by" Worsham Sprinkler Co. for five years after he stopped working for Worsham Sprinkler Co. Defendants claim that, after the five year period, the Employment Agreement preserved Wes Worsham's right to use his name as part of the name of a future sprinkler business. Plaintiff contests that interpretation. Because of the disposition discussed below, it is unnecessary to assess Defendant's argument with respect to the Merger Agreement and the Employment Agreement.

registered in 1993.  The parties agree that Plaintiff owned that stylized mark when, in 2003, Plaintiff declined to renew the registration, thereby allowing the mark to be cancelled on the federal Principal Register of the United States Patent and Trademark Office ("USPTO").

Worsham Sprinkler Co. struggled through several years of financial difficulty before VSC acquired it in 2003.  VSC sought to make Worsham Sprinkler Co. financially sound and to re-establish its presence in the market.  To that end, VSC merged several Worsham Sprinkler Co. branches into its own branches in markets where both companies had offices.  Where VSC had no branches in a market, it propped Worsham Sprinkler Co. up by associating VSC and Worsham Sprinkler Co. together by using similar and associated logos, advertising, the VSC website, and its letterhead.  VSC also created a new stylized "WSC" logo, colored red and white, the same colors used in the stylized "VSC" logo.  Evidence at trial demonstrated that, when Worsham Sprinkler Co. or the "WSC" logo is advertised or marketed, those marks often are modified by the words "A VSC Company," or are set alongside the "VSC" stylized logo. Today, Worsham Sprinkler Co. is a financially stable company.  It has between two and five thousand customers in Virginia and bids on several thousand sprinkler projects per year.

Upon formation in 2005, Wes Worsham Fire Protection, LLC sent a letter to vendors and builders in Virginia announcing the

formation of the new company.   The announcement contained a disclaimer that said "Wes Worsham Fire Protection, LLC, is a new venture and is not affiliated with Worsham Sprinkler Co. or Wes-Way Sprinkler Company." Similar disclaimers appear on Wes Worsham Fire Protection, LLC's bid proposal forms and its facsimile cover sheets.  When Plaintiff received that announcement in January 2005, it  attempted to convince Defendants not to use the name "Worsham" in the new company's name.  That effort failed, and Plaintiff then filed this action seeking a declaratory judgment with respect to ownership and infringement of trademark rights, a preliminary injunction enjoining the use of Defendant's trade name, a subsequent permanent injunction of that use, and damages for losses incurred as a result of infringements.

In its Complaint, the Plaintiff asserted that it had rights in the trade name "Worsham," (Compl. ¶¶ 4, 10-12, 18, 24) (Docket No. 1), and asked for a declaratory judgment "that the defendants' use of the name Worsham as part of their trade name constitutes a violation of the Lanham Act." (Compl. 7.)  However, that position changed such that, in its pre-trial proposed findings of fact, Plaintiff claimed that the allegedly infringed trade names, trademarks, and service marks were "Worsham Sprinkler Company" and "Worsham Sprinkler." (PL.'S PROPOSED FINDINGS OF FACT AND CONCL. OF LAW  6.) (Docket No. 21).  And, the case was tried on that theory.  In its post trial findings of facts, Plaintiff claimed

that "Worsham Sprinkler Company" and "Worsham Sprinkler" are the trade names and service marks at issue. (PL.'S POST-TRIAL PROPOSED FINDINGS OF FACT AND CONCL. OF LAW 11.) (Docket No. 48). The Defendants approached the record and the legal analysis in the same fashion. (DEF.'S FINAL PROPOSED FINDINGS OF FACT AND CONCL. OF LAW 15.) (Docket No. 49).

Then, in PLAINTIFF'S REBUTTAL TO DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW, Plaintiff argued that, in effect, it claims exclusive rights to use the word "Worsham" in "its marks and trade name (in the commercial sprinkler business)" (PL.'S REBUTTAL TO DEF.'S FINAL PROPOSED FINDINGS OF FACT AND CONCL. OF LAW 6.) because the surname "Worsham" is used with the terms "sprinkler" and "fire protection," which the parties have agreed are synonymous. Considering that the case was tried on the predicate that the marks at issue are "Worsham Sprinkler Company" and "Worsham Sprinkler," it is now too late to resurrect the contention that one of the marks in dispute is the word "Worsham."

The foregoing background facts are established by stipulation or the preponderance of the evidence. Considering the mode of analysis that must be employed to decide a trademark infringement case, the other operative and material facts, which also are established by a preponderance of the evidence, are integrated into the parts of the analysis to which the facts relate.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

To prevail on its claim for trademark infringement and unfair competition under Section 43(a) of the Lanham Act, a plaintiff must show both that: (1) "it has a valid protectible trademark," trade name, or service mark, and (2) the defendant's use of a colorable imitation of the trademark is likely to cause confusion.[4]  Petro Stopping Ctrs. v. James River Petroleum, Inc., 130 F.3d 88, 93 (4th Cir. 1997); Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc., 43 F.3d 922, 930 (4th Cir. 1995).  Upon requisite proof, a court of competent jurisdiction may issue an injunction prohibiting use of a confusing trade mark or trade name.

---

[4] Section 43(a) of the Lanham Act states in pertinent part:
1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
    (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or
    as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person...
shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(2000) (hereinafter all citations to the U.S.C. are from the 2000 ed.).

I.    Protection of Marks

"Section 43(a) of the Lanham Act . . . has been construed to
protect against trademark, service mark, and trade name
infringement even though the mark or name has not been federally
registered." Perini Corp. v. Perini Const., Inc., 915 F.2d 121,
124 (4th Cir. 1990).  A trademark is "a designation used 'to
identify and distinguish' the goods of a person," while a service
mark is a designation to identify and distinguish the services of
a person.  J. Thomas McCarthy, McCarthy On Trademarks and Unfair
Competition § 3:1 [hereinafter McCarthy].  A trade name is "any
name used by a person to identify his or her business or vocation."
15 U.S.C. § 1127.  A mark can simultaneously be a trademark,
service mark, and trade name.

In this case, the words "Worsham Sprinkler Company" and
"Worsham Sprinkler" function as both trade names and service marks.
When discussing the law of trademarks generally, this opinion will
use the term "marks" to refer to trademarks, trade names and
service marks.

Existence of a registered mark is "prima facie evidence of the
validity of the registered mark . . ., of the registrant's
ownership of the mark, and of the registrant's exclusive right to
use the registered mark. . ." Emergency One v. American Fire Eagle
Engine Co., 332 F.3d 264, 268 (4th Cir. 2003).  Although the
service mark "WORSHAM SPRINKLER" (stylized) was registered by

Worsham Sprinkler Co. on the Principal Register of the USPTO, that mark was cancelled on January 10, 2004 after VSC and Worsham Sprinkler Co. elected not to continue the registration.   Thus, neither mark at issue in this action is registered.   Therefore, it must be determined what, if any, protectable marks Plaintiff owns at common law.

"At common law, trademark ownership is acquired by actual use of the mark in a given marketplace."   Emergency One, 332 F.3d at 267 (citing United Drug Co., v. Theordore Rectanus Co., 248 U.S. 90, 97-98 (1918)).   The mark's owner acquires "both the right to use a particular mark and the right to prevent others from using the same or a confusingly similar mark."   Id. (quoting Homeowners Group, Inc. v. Home Mktg. Specialists, Inc., 931 F.2d 1100, 1106 (6th Cir. 1991).   Where two users claim a right to use the same or similar mark, the first user to validly appropriate use of that mark generally has priority over the second, or junior, user.   Id. at 268.   "[A] plaintiff asserting a claim of infringement against common-law trademark ownership rights bears the burden of establishing its exclusive right to use the mark by actual use in a given territory."   Id. at 269.

Also, "[e]ligbility for protection depends upon the market's association between the particular mark and the goods or the business, which, in turn, depends upon the degree of the mark's peculiarity."   Perini, 915 F.2d at 124.   To facilitate that

9

determination, the Fourth Circuit employs the system established by the Second Circuit for classifying marks.  Under that approach, marks are designated as generic, descriptive, suggestive, arbitrary, or fanciful.  Id. (citing Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4, 9 (2d Cir. 1976).  Under this hierarchy of protectability, a mark that is generic receives no protection.  However:

> if a mark is merely descriptive, then proof of secondary meaning in the marketplace is required for the mark to be eligible for protection.  Names – both surnames and first names – are regarded as descriptive terms and therefore one who claims federal trademark rights in a name must prove that the name has acquired secondary meaning.

Id. at 124-25 (internal citations omitted) (emphasis added).  Both parties agree that the marks here at issue are properly categorized as "descriptive."

The parties stipulated that Plaintiff has used the trade names "Worsham Sprinkler Company" and "Worsham Sprinkler Company, Inc." in interstate commerce in both Virginia and other markets throughout the southeast Atlantic region of the United States since the 1960s, well before the first use, in any market, of the names "Wes Worsham Fire Protection" or "Wes Worsham Fire Protection, LLC."  The parties also stipulated that Plaintiff continues to use the names "Worsham Sprinkler Company" and "Worsham Sprinkler Company, Inc." in interstate commerce in connection with its business operation.  Plaintiff also asserts that it has a

protectable right in the phrase "Worsham Sprinkler."  Defendants
disagree on that point, but the parties do not dispute that
Plaintiff has continuously used the words "Worsham Sprinkler" in
interstate commerce since before the formation of Wes Worsham Fire
Protection, LLC.  Because Plaintiff is the senior user of the these
three trade names and service marks, Plaintiff's names and marks
will be protected if they have acquired secondary meaning within
the relevant market.[5]

---

[5] At trial, Plaintiff agreed with Defendants that Plaintiff
had no rights to the word "Worsham" outside of the commercial
sprinkler business as defined by the relevant geographic market.
Specifically, Plaintiff claim no infringement by Virginia Tech's
naming of their football field as Worsham Field.
    Nor is there any dispute respecting the Plaintiff's stylized
service mark "WSC."  That mark appears as either red block
lettering on a white rectangular background or white block
lettering on a red rectangular background that reads "WSC"
(stylized).  Defendants' mark is visually distinguishable from
Plaintiff's stylized mark. Defendants' stylized mark contains burnt
orange lettering with brown borders (the colors of Virginia Tech).
The borders form an oval positioned latitudinally like a rugby ball
resting on the ground and the border of a long, narrow rectangle is
superimposed across the middle of the oval.  The words "WES
WORSHAM" arch just under the top of the oval, while the words "FIRE
PROTECTION" fill the rectangle.  Below the box are the letters
"LLC" and small orange flames rise up from the bottom of the oval.
(See DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCL. OF LAW
(Docket No. 23) at 8, 12 for color reproductions of the parties
service marks.)
    At trial, the parties agreed that, even if these marks were
protected, there was no infringement because of the significant
visual differences between the two.  It is not necessary to assess
whether the Plaintiff owns a protected right in the "WSC" service
mark because Defendants' mark is not likely to cause confusion with
Plaintiff's mark. 15 U.S.C. § 1125(a); see McCarthy, supra, Figs.
23:25E,F,G,H, 23:47B, 23:52A (examples of marks found not likely to
cause confusion).

## II.   Secondary Meaning

Secondary meaning is a question of fact.  See Little Tavern Shops, Inc. v. Davis, 116 F.2d 903, 906 (4th Cir. 1941).  In Perini, the Fourth Circuit explained the term "secondary meaning."

> Secondary meaning is the consuming public's understanding that the mark, when used in context, refers, not to what the descriptive word ordinarily describes, but to the particular business that the mark is meant to identify.  For example, the descriptive phrase "quick stop" used to describe convenience stores would only acquire secondary meaning if a substantial portion of the consuming public were to associate the term with a particular business.
>
> "Secondary meaning exists if in fact a substantial number of present or prospective customers understand the designation when used in connection with a business to refer to a particular person or business enterprise." Food Fair Stores, Inc. v. Lakeland Grocery Corp., 301 F.2d 156, 160-61 (4th Cir. 1962).  In the case of a trade name, secondary meaning is "[t]he power of a name ... to symbolize a particular business." Ideal Toy Corp. v. Kenner Products Div'n of General Mills Fun Group, Inc., 443 F. Supp. 291, 305 n. 14 (S.D.N.Y. 1977).  If a trade name has not acquired secondary meaning, the purchaser will not make an association with a particular producer and thus will not be misled by an identical or similar mark.  Thompson Medical Co. v. Pfizer, Inc., 753 F.2d 208, 216 (2d Cir. 1985).

Perini, 915 F.2d at 125 (citations edited for use herein).

In Perini, the Court of Appeals also outlined the requirements for proving secondary meaning.  The Court explained that:

> "Proof of secondary meaning entails
> vigorous evidentiary requirements." Thompson
> Medical, 753 F.2d at 217.  The Second Circuit
> has offered the following factors as relevant
> to, though not dispositive of, the "secondary
> meaning" inquiry:  (1)  advertising
> expenditures; (2) consumer studies linking the
> mark to a source; (3) sales success; (4)
> unsolicited media coverage of the product; (5)
> attempts to plagiarize the mark; and (6) the
> length and exclusivity of the mark's use.

Id.  This formulation is generally followed in subsequent Fourth

Circuit decisions,[6] and in other circuits.[7]

The factors set out in Perini provide the framework for

assessing whether the record in this action established a secondary

meaning in the marks at issue here.  And, of course, the Plaintiff

must show secondary meaning among present or prospective customers

in the relevant trade area before the alleged infringer entered the

market.  Id. at 125-26.  The trade area for that assessment is the

Commonwealth of Virginia because, with the exception of one

completed project in North Carolina, Virginia is the Defendants'

trade area.

---

[6] See, e.g., International Bankcorp, LLC. v. Societe des Bains
de Mer et du Cercle Des Etrangers a Monaco, 329 F.3d 359, 370 (4th
Cir. 2003); U.S. Search, LLC. v. U.S. Search.com Inc., 300 F.3d
517, 525 (4th Cir. 2002).

[7] See, e.g., In re Steelbuilding.com, 415 F.3d 1293, 1300
(Fed. Cir. 2005); Herman Miller, Inc. v. Palezzetti Imports and
Exports, 270 F.3d 298, 311 (6th Cir. 2001); Thompson Medical Co. v.
Pfizer, Inc., 753 F.2d 208, 215 (2d Cir. 1985).

## A. Proof Through Survey Evidence And Consumer Testimony

Though no single factor is determinative, "survey evidence is generally thought to be the most direct and persuasive way of establishing secondary meaning." U.S. Search, LLC v. U.S. Search.com, Inc., 300 F.3d 517, 526 n.13 (4th Cir. 2002) (citing Zatarains, Inc. v. Oak Grove Smokehouse, Inc., 698 F.2d 786, 795 (5th Cir. 1983); see also Frosty Treats, Inc. v. Sony Computer Entertainment America, Inc., 426 F.3d 1001, 1005 (8th Cir. 2005) (customer testimony or survey evidence is the most probative of secondary meaning). Testimony of consumers is another direct form of proof of secondary meaning. Plaintiff offered no consumer surveys. Nor did any consumer testify to evidence of secondary meaning.

However, the Plaintiff offered testimony of its own employees and of the employees of its suppliers in an effort to fill that void. For instance, several VSC employees testified that, in their minds, the terms "Worsham Sprinkler Co." and "Worsham Sprinkler" have the power to identify the specific business they represent (i.e. have secondary meaning). However, testimony of Plaintiff's employees and executives is fraught with bias and is not probative of consumer perception. 815 Tonawanda St. Corp. v. Fays Drug Co., Inc., 842 F.2d 643, 648 (2d Cir. 1988) (testimony of owner of plaintiff company was not probative because it is biased); see McCarthy, supra, § 15:39 and n.1. There also was testimony from

14

Plaintiff's suppliers that they are very familiar with the trade names "Worsham Sprinkler Company" and "Worsham Sprinkler." Several of those witnesses testified that they think of the Plaintiff when those names are articulated. Also, the evidence showed that suppliers think of Worsham Sprinkler Co. as an old line, high quality company that provides good service. The testimony of vendors and suppliers "is often characterized as of 'little value,' since it may be biased and does not necessarily reflect the views of the consumer class." McCarthy, supra, § 15:38. That sound principle renders the testimony of Plaintiff's suppliers of little utility in proving secondary meaning.

### B. Proof By Circumstantial Evidence

Secondary meaning also may be established by circumstantial evidence and it is of equal importance in the secondary meaning calculus as is direct evidence. Circumstantial evidence includes proof of the exclusivity and length of use of the mark, advertising modes and expenses, unsolicited media coverage, revenues, and intentional copying by others. Frosty Treats, 426 F.3d at 1005; Flynn v. AK Peters, Ltd., 377 F.3d 13, 20 (1st Cir. 2004); see U.S. Search, 300 F.3d at 524; Perini, 915 F.2d at 125; see generally McCarthy, supra, § 15:30 "Direct and Circumstantial Evidence."

The record contains no evidence that Plaintiff has been the subject of unsolicited media coverage. Nor is there evidence that anyone ever has intentionally copied the Plaintiff's marks.

However, there is evidence about the length and exclusivity of the mark, sales volume, and advertising expenses and mode.

### (1)  Length And Exclusivity Of The Mark

The names "Worsham Sprinkler Company, Inc.," "Worsham Sprinkler Company," and "Worsham Sprinkler" have been used in the relevant market for over thirty five years.  The record shows that Wes Worsham began a business called "Wes-Way Fire Protection," but, until Wes Worsham Fire Protection LLC was formed in 2005, the word "Worsham" had not been used in any trade name or mark in the relevant market other than the marks at issue.  Therefore, the length and exclusivity factor weighs in favor of Plaintiff.

### (2)  Advertising Expense

Advertising expenditures provide circumstantial evidence of secondary meaning because, if extensive, they may help establish the inference that consumers associate a trade mark or trade name with a specific company.  See Perini, 915 F.2d at 125. The Plaintiff must prove that the advertising had the desired effect of creating a secondary meaning in Plaintiff's trade names and marks. This is because "[a]lthough it is true that advertising is a relevant factor in determining whether a mark has acquired a secondary meaning, it is the effect of such advertising that is important, not its extent.  To be effective in this respect, the advertising must cause the public to equate the mark with the

source of the product." Co-Rect Products, Inc. v. Marvy! Advertising Photography, Inc., 780 F.2d 1324, 1332 (8th Cir. 1985) (internal citation omitted).

Plaintiff concedes that its advertising expenditures are de minimis. However, testimony at trial demonstrated that there are relatively few design-build fire protection companies in Virginia and that the design-build fire protection industry in the Virginia area is fairly tight-knit. Therefore, the advertising and marketing of fire protection systems is accomplished largely by face-to-face communication with potential customers in the construction industry or commercial real estate owners. Accordingly, the Plaintiff has not incurred significant expense for advertising using print or visual media.

Plaintiff argues that, because traditional media advertising generally is not used in its industry, the lack of advertising expenditures should not weigh against a finding of secondary meaning. To support its argument, Plaintiff cites The Morningside Group Ltd. v. Morningside Capital Group, LLC, 182 F.3d 133, 139 (2d Cir. 1999) (" Although evidence of advertising can bolster a mark's strength, its absence need not weaken the mark. When a claimant has no need for traditional advertising because of the nature of its market, it should not feel compelled to advertize simply to protect its service mark."). The language from Morningside Group

comes from that court's discussion of the test for actual confusion rather than secondary meaning, and, therefore, is not on point.

Nevertheless, evidence of efforts to conduct face-to-face marketing serve the same proxy purpose as advertising expenditures in determining secondary meaning.  That is because both methods attempt to circulate and promote the company's trade names and marks in the relevant marketplace and, if successful, help to establish a secondary meaning in the minds of consumers.

At trial, there was testimony that, like many other companies in the fire protection industry, Plaintiff engages in face-to-face promotion and solicitation of business and spends significant time cultivating business relationships.  However, the record did not reveal the cost of the Plaintiff's face-to-face advertising and publicity expenditures.

There was some evidence that showed Worsham Sprinkler Co.'s recent efforts to use print media to promote its name and business. For instance, VSC, the Plaintiff's parent corporation, publishes a monthly newsletter, which has included several articles about Worsham Sprinkler Co.  Also, Worsham Sprinkler Co. received some mention in independent trade publications because it is a subsidiary of VSC, which, according to "Contractor" magazine, was ranked second in fire protection in both 2004 and 2005.  The evidence also showed that Worsham Sprinkler Co. advertises using a brochure, logos on its hats, t-shirts, stickers and bright red

vehicles.  The total expenditure on print, media and promotional literature and products was quite small.

Taken as a whole, the record respecting the Plaintiff's advertising expenditures is skimpy.  The most that can be said is that the Plaintiff has made a considerable, but unquantified, effort over the years to promote the marks at issue as part of its face-to-face business solicitation program.  Whether the recognition given the marks by consumers is attributable to that effort or to the Plaintiff's reputation for providing quality service is not ascertainable from the record.

### (3)   Revenues

Another circumstantial measure of success is sales volume or revenues generated.  Worsham Sprinkler Co.'s annual revenues were in excess of $20 million throughout the 1990's, and were approximately $18 million a year in 2002, 2003, and 2004.  Evidence at trial demonstrated that VSC is among the five largest sprinkler companies in the country, and it expected to have revenue of approximately $100 million in 2005.  This means that Worsham Sprinkler Co. has enjoyed significant sales success relative to other similar fire protection companies in the nation.  Testimony also revealed that fire protection contracts range in price from $25,000 to $3 million.  Taken together, these figures demonstrate that numerous clients know of, have confidence in, and are willing

19

to pay goodly sums of money to Worsham Sprinkler Co. for its services.[8]

Considering all evidence of secondary meaning, it appears that the Plaintiff has satisfied – albeit narrowly – its burden to prove secondary meaning.  The record respecting the long and exclusive use of the marks at issue – Worsham Sprinkler Co., Worsham Sprinkler Co, Inc., and Worsham Sprinkler – in the Virginia market, business promotion through word-of-mouth, and the substantial sales revenues leads to that conclusion.  Therefore, "Worsham Sprinkler Company," "Worsham Sprinkler Company, Inc.," and "Worsham Sprinkler" are protected marks.

## III. Infringement

Section 43(a) of the Lanham Act prohibits the use in commerce of any protected "word, term, name, symbol, or device, or any combination thereof" in a manner "which is likely to cause confusion, or to cause mistake, or to deceive" as to the "affiliation, connection, or association of such person with another person."   15 U.S.C. § 1125(a)(1)(A) (2000 ed.).  As explained previously, the Lanham Act affords protection to Plaintiff's common law marks.  Perini, 915 F.2d at 124.  To prove infringement of its protected marks, Plaintiff must show that

---

[8] There is evidence that Worsham Sprinkler Company was in severe financial distress during the two years before acquisition by VSC in 2003. (Test. of Martin Giles, Tr. p. 71.)  However, revenues returned to an approximately $18 million a year in 2003.

"there exists a likelihood that an appreciable number of ordinarily prudent purchasers will be misled, or indeed simply confused, as to the source of the goods in question." Perini, 915 F.2d at 127 (internal quotations omitted).  Likelihood of confusion is a question of fact and must be proved by preponderance of the evidence. Anheuser-Busch, Inc. v. L. & L. Wings, Inc., 962 F.2d 316, 318 (4th Cir. 1992).

The Fourth Circuit has developed a number of non-dispositive, analytic factors to determine whether there is a likelihood of confusion between marks.  In Pizzeria Uno Corp. v. Temple, 747 F.2d 1522, 1527 (4th Cir. 1984), the Fourth Circuit established seven factors: (1) strength or distinctiveness of the plaintiff's mark; (2) similarity of the two marks; (3) similarity of the goods/services the marks identify; (4) similarity of the facilities the two parties use in their businesses; (5) similarity of advertising; (6) defendant's intent; and (7) actual confusion.  The Fourth Circuit added two other factors in subsequent decisions. See, e.g., Anheuser Busch, 962 F.2d at 320 ((8) quality of the defendant's product and (9) sophistication of the consuming public).

However, "not all these factors are always relevant or equally emphasized in each case." Pizzeria Uno, 747 F.2d at 1527.  In discussing the application of the factors, the Fourth Circuit has made clear that, while certain factors must always be analyzed,

"certain factors may not be germane to every situation; moreover, though several factors are simultaneously present, some factors may, depending upon the case, be more important than others." Sara Lee Corp. v. Kayser-Roth Corp., 81 F.3d 455, 463 (4th Cir. 1996).

### A.    Strength Of Plaintiff's Name And Mark

"The first and paramount factor under this set of factors is the distinctiveness or strength of the two marks." Pizzeria Uno, 747 F.2d at 1527.  The concepts of secondary meaning and a mark's strength are often confused.  As McCarthy explains:

> There is a correlation between "strength" and "secondary meaning." A non-inherently distinctive term must have at least that quantum of strength called "secondary meaning."  Without such secondary meaning, such terms are not "trademarks" at all.  Non-inherently distinctive terms need that weight or amount of strength to bring them to life as marks in the first place. From there on, [through use in commerce] they grow in strength like any mark. . .
> Finding a secondary meaning is not the end of the enquiry, but only the beginning.  The ultimate issue in cases of non-inherently distinctive marks is whether the senior user's mark has enough strength to prevent this particular defendant's use. . .
> When determining the commercial or marketplace strength of a mark, the courts look to the same kind of evidence of real world recognition of the mark as is used to decide the presence or absence of secondary meaning to determine whether a non-inherently distinctive designation is or is not a valid mark.

McCarthy, supra, § 11:82

Although the Fourth Circuit has not adopted the so-called "two-pronged" test of secondary meaning, six other circuits have. See id. § 11:83 (citing numerous cases from the Court of Appeals

for the Second, Third, Fifth, Ninth, Tenth and Eleventh Circuits, which use the two-pronged test). The two prong test looks at (1) conceptual strength: whether the mark is fanciful, arbitrary, suggestive, or descriptive; and (2) commercial strength: the degree of marketplace recognition of the mark.  _Id_.  The Fourth Circuit has explained the analysis of strength of the mark in almost the same manner.  The Fourth Circuit wrote that:

> [t]he strength of the mark ultimately depends on the <u>degree to which the designation is associated by prospective purchasers with a particular source</u>.  Thus, courts must examine, in addition to the mark's characterization as suggestive or descriptive, the <u>extent of secondary meaning</u> a mark has acquired in the eyes of consumers.

_Petro_, 130 F.3d at 93 (emphasis added).  Thus, to determine the strength of Plaintiff's marks, a court must look at where the mark falls on the conceptual spectrum and at its commercial strength.

The parties agree that Plaintiff's marks are merely descriptive, and, thus, not inherently distinctive.  Thus, the marks fall on the weak side of the conceptual spectrum.

In terms of commercial strength, as discussed above, the marks have attained, if only just barely so, the quantum of strength required to establish secondary meaning.  However, as noted in the language cited above in _Petro_, the court must still determine the extent of the marks' secondary meaning.

In its post-trial findings of fact and conclusions of law, the Plaintiff contends that its marks are strong by virtue the

23

longevity of their use.  Plaintiff then states, in a conclusory fashion, that "the testimony produced at trial makes it clear that the name and mark are significantly associated with the longevity and success of plaintiff's business and the reputation it enjoys for the high quality of its services." (DEF.'S POST-TRIAL FINDINGS OF FACT 15-16.)  From that predicate, the Plaintiff argues that its marks are strong.

Arguing that Plaintiff's marks are weak, Defendants first assert that Plaintiff has "produced only scant evidence that 'prospective purchasers'--the relevant class--associate plaintiff's marks with a particular source of services." (DEF.'S POST-TRIAL FINDINGS OF FACT 22.)  As discussed above, Plaintiff offered no evidence from prospective purchasers about the extent to which consumers of sprinkler services associate Plaintiff's marks with Plaintiff.  See, infra, Sec. II.A.  Instead, Plaintiff offered the testimony of its own employees and some vendors, not customers.  However, because the strength of a mark depends on the extent to which prospective purchasers associate the mark with the mark's owner, Petro, 130 F.3d at 93, evidence from Plaintiff's employees or vendors is not of great utility in assessing the strength of its marks.

However, Plaintiff's failure to produce any direct evidence of secondary meaning in the minds of current or prospective purchasers is not fatal to finding their marks are strong because secondary

meaning may be established through circumstantial evidence.  See Frosty Treats, 426 F.3d at 1105-06; Flynn, 377 F.3d at 20; Perini, 915 F.2d at 125.  As discussed above, through its thirty five years of successful business among several thousand customers and its significant revenues, Plaintiff's trade names and service marks have obtained secondary meaning in the fire protection industry in Virginia.

Next, Defendants assert that the composition of Plaintiff's marks makes the marks weak.  Their argument is that "Worsham Sprinkler," "Worsham Sprinkler Company," and "Worsham Sprinkler Company, Inc." are descriptive marks comprised of descriptive, generic, and disclaimed terms and lack a dominant segment that would give the mark strength.

"Inc." and "Company" are generic terms, which standing alone may not be trademarks.  McCarthy, supra, § 11:2.  Likewise, the parties stipulated that "fire protection" and "sprinkler" mean the same thing in the fire protection industry and, thus, Defendant admits that the word "Sprinkler" is not the dominant segment of its mark.  Consequently, Defendants argue, the strength of Plaintiff's marks must be assessed solely by the word "Worsham," which is a merely descriptive term and serves as the most dominant segment of the mark.  Citing Pizzeria Uno for the proposition that "a descriptive word can never constitute the dominant part of a mark," Pizzeria Uno, 747 F.2d at 1530 (citing  American Throwing Co. v.

25

Famous Bathrobe Co., 250 F.2d 377, 381-82 (CCPA 1957); National Nugrape Co. v. Judge & Dolph, 154 F.2d 521, 522 (CCPA 1946); American Brewing Co. v. Delatour Beverage Corp., 100 F.2d 253, 255 (CCPA 1938)), Defendants argue that Plaintiff's marks and trade names contain no dominant segment and therefore are weak.

That argument is not well-founded.  The language quoted from Pizzeria Uno refers to "descriptive words," meaning words that describe (such as adjectives), not marks that are deemed "descriptive," as that term is used when classifying a mark within the Second Circuit's classic quinquepartite trademark classification scheme. See American Throwing, 250 F.2d at 381-82 ("knit" and "wiper" were descriptive words describing the products at issue and not the dominant segment of the competing marks); Nat'l Nugrape Co., 154 F.2d at 522 (the word "grape" describes the products of both parties and so was not the dominant segment).  In contrast, "Worsham" is not a descriptive word, but rather a personal name.

Additionally, Pizzeria Uno echoed the decision in American Throwing Co. that "disclaimed descriptive words could [n]ever constitute the dominant part of a mark. [This is because] the disclaimed words are clearly not registrable, [and] apart from the mark shown, any one has the right to use those words in a descriptive way, if descriptive of his merchandise." American Throwing Co., 250 F.2d at 381 (quoting American Brewing, 100 F.2d

at 255 (emphasis added).  However, Plaintiff has not disclaimed the word "Worsham."

More importantly, a surname in a composite surname/generic word mark can constitute the dominant segment and earn the mark secondary meaning.  See In re Chatham Int'l. Inc., 380 F.3d 1340, 1342 (Fed. Cir. 2004) (surname "Gaspar" held to be dominant segment); Blue & White Food Prod. Corp., v. Shamir Food Ind., Ltd., 350 F. Supp. 2d 514, 519 (S.D.N.Y. 2004) (surname "Shamir" dominant segment where other segment was generic word "salad"); E. & J. Gallo Winery, 967 F.2d at 1291 ("personal names. . . are treated as strong marks upon a showing of secondary meaning"; finding "Gallo" had acquired secondary meaning and was a strong mark).  Consequently, Defendant's second argument fails because it inaccurately captures the meaning of the quoted language from Pizeria Uno and, thereby, wrongly applies it to this case.

Third, the Defendants argue that the "Plaintiff's own advertising highlights the weakness of its marks."  (Post-Trial Concl. of Law, p. 23).  Defendants argue that, when Worsham Sprinkler Co. advertises its marks, those marks are frequently accompanied by the VSC name or logo.  Defendants submitted evidence showing that, on Worsham Sprinkler Co. hats, t-shirts, and their vehicles, the Worsham Sprinkler Co. trade name and mark are accompanied by the VSC trade name and mark.  The Defendants contend that this is graphic proof that the marks are not strong enough to

27

stand alone.  In other words, the Defendants say that, if the name "Worsham Sprinkler Co." or "Worsham Sprinkler," standing alone, was thought sufficient by the Plaintiff to associate it and its services with a particular source, there would not likely be a need to bolster Plaintiff's marks with the stylized VSC logo and words "A VSC [stylized] Company."  As posited, the argument goes too far, but the evidence of this mode of advertising is further proof that Plaintiff's marks, standing alone, are not strong enough.

In sum, Plaintiff did not prove that its marks have sufficient commercial strength to be held to be strong marks.

**B.   Sophistication Of Consumers**

In Perini, the Fourth Circuit held that "[a]lthough no factor is dispositive of the "likelihood of confusion" inquiry, the sophistication and expertise of the usual purchasers can preclude any likelihood of confusion among them stemming from the similarity of trade names."  915 F.2d at 127.  Furthermore, "[t]he relative sophistication of the market may trump the presence or absence of any other factor." Sara Lee, 81 F.3d at 467.  Defendants argue that the customers of the two parties, which are general contractors in the construction industry, have sophisticated knowledge about design-build fire protection companies in the Virginia area and that, consequently, the competing marks are unlikely to cause confusion.

28

Evidence at trial established that decision-makers working for general contractors are quite knowledgeable and sophisticated about the industry in which the parties compete.  Employees working in management and bidding generally are college graduates, often with a major in construction management.  They usually have obtained experience through internships, lower-level positions, or significant field experience.  Also, the general contractors tend to form personal business relationships with the design-build fire protection companies so that they are very familiar with the possible source of services.  Because of the volume of work each contractor does, and the competitive bidding process, these contractors deal with numerous design-build companies at once.

Testimony also showed that, because fire protection design is not incorporated in the engineer/architect's plans, the lead time for the purchase, design and building of fire protection service is greater than other components of a construction job.  Additionally, as in Perini, these general contractors' "sensitivity is heightened by the responsibility of sensibly spending millions of dollars." Perini, 915 at 127.  Accordingly, the contractors tend to be aware when changes occur at a local design-build fire protection company or when a new player enters the market.   Therefore, the parties' customers are highly sophisticated.

Defendants argue that, because general contractors are sophisticated, and because the evidence showed that the contract

29

bidding and award system is time and labor intensive, there is no chance that contractors will ever mistakenly award a contract to the wrong fire protection company due to confusion about their trade names. The record, taken as a whole, demonstrates that Defendants are correct that this type of error is highly unlikely to occur.

However, confusion in awarding contracts is not the only type of confusion, actual or likely, that is probative of a finding of infringement. Not all employees of these contractors are equally sophisticated and knowledgeable of the industry. A large general contracting company may employ hundreds of people, and confusion among mid or lower-level employees may still occur and can have significant consequences. For example, if a secretary were to send by facsimile a price list to the wrong company, such a disclosure would have significant economic and non-economic consequences. As will be discussed below, where damage to a senior user is the likely result of confusion injected into the market by a junior user's use of a confusingly similar trade name, liability for trademark infringement may exist as a species of unfair competition. 15 U.S.C. § 1125(a); see generally McCarthy, supra, § 2:7. Therefore, the other factors must still be assessed to determine whether Plaintiffs have proved a case of infringement.

### C.   Similarity Of Services

The two parties provide essentially the same services in the Virginia market.  While Wes Worsham Fire Protection LLC does not yet provide fire protection services to building owners and Worsham Sprinkler Co. does, both compete for business with general contractors.

### D.   Similarity Of Advertising

There was little testimony as to how Wes Worhsam Fire Protection LLC advertises other than the so-called "Team Reunited" letter which introduced Wes Worsham Fire Protection, LLC as a new entrant in the Virginia market.  However, testimony established that, in general, design-build fire protection companies use advertisements in the Yellow Pages and online, and rely on in-person business promotion.  Therefore, the form of advertising is similar.

### E.   Quality of Services

Testimony from several vendors of Worsham Sprinkler Co. revealed that Worsham Sprinkler Co. has a stellar reputation for having provided good quality services over the past thirty years. The record did establish that Worsham Sprinkler Co. suffered financial difficulties between 2001 and 2003, when VSC purchased Worsham Sprinkler Co. As a result, John Lawson, President and CEO of W.M. Jordan & Company, a general contractor, testified that he thought Worsham Sprinkler Co. was "a dormant company." However, no

testimony revealed that Worsham Sprinkler Co. ever provided poor services.   There was no testimony as to the quality of services provided by Wes Worsham Fire Protection LLC.

### F.   Similarity Of The Competing Marks/Names

Generally, the degree of similarity between marks is measured by comparing the sight, sound and meaning of the marks at issue. See generally McCarthy, supra, § 23:21 ("Sight, Sound and Meaning Trilogy").  This three part test derives from the 1938 Restatement of Torts § 729, from which the Fourth Circuit drew in developing its trademark law.   McCarthy, supra, 23:21 n.4 (citing Standard Brands, Inc. v. Eastern Shore Canning Co., 172 F.2d 144,(4th Cir. 1949)).  The comparison is made by looking at the marks as a whole and does not hinge upon "how closely a fragment of a given use duplicates the trademark, but on whether the use in its entirety creates a likelihood of confusion."   Anheuser-Busch, 962 F.2d at 319.  This principle is often referred to as the "anti-dissection" rule.   See generally McCarthy, supra, § 23:41.

Nonetheless, it is also "necessary to assess similarity and differences in the marks, not in a vacuum, but in the actual use of the marks in the commercial context.  The issue then is whether the marks, as actually used are so similar in appearance and sound as to result in confusion."   IDV North America, Inc. v. S & M Brands, Inc., 26 F. Supp. 2d 815, 825 (E.D. Va. 1998) (citing Petro, 130 F.3d at 94); see also Carefirst of Maryland, Inc. v. First Care,

P.C., 434 F.3d 263, 271 (4th Cir. 2006)("we must examine the allegedly infringing use in the context in which it is seen by the ordinary consumer . . . [B]ecause the likelihood-of-confusion analysis looks to the actual use of competing marks, a comparison of the texts of the two marks alone is insufficient if the marks have different appearances in the marketplace.") (internal citations omitted).

When set side by side, "Worsham Sprinkler Company, Inc.," "Worsham Sprinkler Company," "Worsham Sprinkler," on one hand, and "Wes Worsham Fire Protection, LLC," on the other, do not look or sound similar.  However, because the parties have stipulated that "fire protection" and "sprinkler" have the same meaning in the fire protection industry, and "Inc." and "LLC" are generic terms, the only difference in meaning between the terms is the first name "Wes."   And so, as in Perini, we must turn to Shakespeare's question: "What's in a name?"[9]

In sight, the words "Wes Worsham" and "Worsham" look only slightly different when written by hand or typed.  Any difference in sound depends on the saying of the word "Wes" with the minimally sufficient elocution needed to establish an audible difference. That difference in sound is sufficient to show that the marks sound different.

_____

[9] "What's in a name?/ That which we call a rose/ By any other name would smell as sweet." William Shakespeare, Romeo and Juliet, Act 2, scene 2.

Defendants argue that the name "Wes," when added to the name "Worsham," so changes the meaning of the word "Worsham" as to distinguish the name "Wes Worsham Fire Protection LLC" from the names "Worsham Sprinkler" and "Worsham Sprinkler Company." This is because, and as the evidence at trial showed, Wes Worsham is the "grandfather" of the design-build fire protection industry in the Virginia area. Therefore, Defendants argue, the use of his full name establishes a distinctive meaning that the use of his last name alone does not.

The evidence showed that Wes Worsham is a well-known name and person in the Virginia fire protection business, and that the name "Wes Worsham Fire Protection, LLC" has a meaning distinct from the name "Worsham Sprinkler Company" or "Worsham Sprinkler." Several witnesses testified that the name "Wes Worsham" calls to mind the man who is the "grandfather" of the industry while "Worsham Sprinkler" or "Worsham Sprinkler Company" simply means a well-known fire protection company that has provided quality services for many years. In this way, the two competitors' marks are different in meaning. That difference is sufficient to distinguish the term "Wes Worsham Fire Protection, LLC" from the Plaintiff's marks.

Plaintiff cites three cases for the proposition that, when two competing trade names share a common surname, the addition of a first name to the surname does not sufficiently change the meaning of the mark to prevent confusion. These cases are: <u>E. & J. Gallo</u>

34

<u>Winery v. Gallo Cattle Co.</u>, 967 F.2d 1280 (9th Cir. 1992); <u>Nina</u>
<u>Ricci, S.A.R.I., v. E.T.F. Ent., Inc.</u>, 889 F.2d 1070 (Fed. Cir.
1989); and <u>John B. Stetson Co. v. Stephen L. Stetson Co., Ltd.</u>, 85
F.2d 586 (2d Cir. 1936).  Plaintiff argues that, where a junior
user poaches the senior user's surname, and the surname is the
dominant part of the mark, the mere addition of a first name does
not cure the unfair use of the trade name.  However, the decisions
on which Plaintiff relies are distinguishable from this case.

In <u>Gallo</u>, the famed winery owners Ernest and Julio Gallo sued
their estranged brother, Joseph, when Joseph refused to cease use
of the name "Gallo" on his "Joseph Gallo" cheeses.  <u>Id</u>. at 1283.
The court held that the mere addition of the name "Joseph" did not
so change the meaning of the dominant segment "Gallo" as to
preclude likely confusion.  <u>Id</u>. at 1292.

Likewise, in <u>Stetson</u>, John B. Stetson Co., the famed maker of
hats, sued Stephen L. Stetson Co., a lessor known maker of hats,
for trademark infringement.  The court held that the addition of
the terms "Stephen L." to "Stetson" did not distinguish the two
marks, especially where Stephen L. Stetson Co.'s advertising
bragged of family tradition.

In <u>Gallo</u> and <u>Stetson</u>, the infringer was either an unknown or
not-as-well-known name in the industry.  By contrast, Wes Worsham
is the "grandfather" of the industry whose name is universally
known    to    potential    customers    in    the    Virginia    fire

35

protection/construction industry.  Thus, unlike the ill-fated and uncelebrated Joseph Gallo and Stephen L. Stetson, the name Wes, when tied to his surname, has an independent significance in the relevant industry.

In Nina Ricci, the well-known shoe and garment company by that name sued Vittorio Ricci, a lessor known but nevertheless successful shoe company, for trademark and trade name infringement. 889 F.2d at 1071-72.  The court found that the plaintiff had protected trademark rights in its family of marks consisting of "Capricci," "Mademoiselle Ricci," and "Signoricci."  Id. at 1073. The court held that "Ricci" was the dominant and unifying name in plaintiff's marks and that Vittorio Ricci's mark was confusingly similar to the plaintiff's marks.  Id.  The court appropriately concluded that to consumers, Vittorio Ricci would signify another associated company.  Id. at 1073; see generally McCarthy, supra, § 23:60 (discussing the "family of marks" doctrine).

In contrast, Worsham Sprinkler Co. has no similar set of associated companies using a unifying trade name segment.  It is possible that consumers may think that Wes Worsham Fire Protection, LLC is associated with Worsham Sprinkler Company, just as the court believed consumers would think Vittorio Ricci was a Nina Ricci affiliate.  However, by spending $37 million to advertise and promote its various product lines, Nina Ricci had cultivated a family of marks all based around the unifying name "Ricci" and

36

these lines had enjoyed considerable success.  In contrast, Worsham Sprinkler Co. does not have a family of common marks and spends <u>de minimis</u> amounts on advertising.  While two sprinkler businesses in Virginia containing the name "Worsham" might create, in theory, the impression that they are related, that posssibility is mitigated because of the notoriety of Wes Worsham in the industry, the disclaimer printed on Wes Worsham Fire Protection's public documents, and the sophisticated and tight-knit nature of the fire protection/construction industry in the Virginia area.

Therefore, on balance, "Wes Worsham" has a different meaning in trade than "Worsham Sprinkler" or "Worsham Sprinkler Company."  This factor, therefore, weighs against a likelihood of confusion.

### G.  Actual Confusion

Generally, "[c]onvincing evidence of significant actual confusion occurring under actual marketplace conditions is the best evidence of a likelihood of confusion.  Any evidence of actual confusion is strong proof of the fact of a likelihood of confusion."  McCarthy, <u>supra</u>, § 23:13.  However, "[n]o evidence of actual confusion is required in order to prove a likelihood of confusion."  <u>Ideal Indus., Inc. v. Gardner Bender, Inc.</u>, 612 F.2d 1018, 1024 (2d Cir. 1979).  The Fourth Circuit has held that a showing of actual confusion "is often paramount."  <u>Lyons P'ship, L.P. v. Morris Costumes, Inc.</u>, 243 F.3d 789, 804 (4th cir. 2001) (quoting <u>Sara Lee</u>, 81 F.3d at 467).

However, analysis of evidence of actual confusion is fact-specific.  Evidence of only a small number of instances or instances narrow in scope may be dismissed as de minimis. McCarthy, supra, § 23:13 and n.1.1.  As the First Circuit has explained, "the law has long demanded a showing that the allegedly infringing conduct carries with it a likelihood of confounding an appreciable number of reasonably prudent purchasers exercising ordinary care."  International Ass'n. of Machinists & Aero Workers v. Winship Green Nursing Ctr., 103 F.3d 196, 201 (1st Cir. 1996). In assessing the weight of the evidence, it is said that:

> Evidence of the number of instances of actual confusion must be placed against the background of the number of opportunities for confusion before one can make an informed decision as to the weight to be given the evidence.  If there is a very large volume of contacts or transactions which could give rise to confusion and there is only a handful of instances of actual confusion, the evidence of actual confusion may receive relatively little weight.

McCarthy, supra, § 23:14; see also Petro, 130 F.3d at 95 ("In light of [plaintiff's] huge volume of commerce, [plaintiff's] meager evidence of actual confusion is at best de minimis."); Inc. Publishing Corp. v. Manhatten Magazine, Inc., 616 F. Supp. 370, 386 (S.D.N.Y. 1985) aff'd without op. 788 F.2d 3 (2d Cir. 1986) ("Given significant volume of sales, isolated instances of actual confusion may be disregarded as de minimis.")  To this extent, the number of instances and the period of time within which actual confusion is

assessed is important.  These precepts guide the assessment of the factual record respecting actual confusion.

Worsham Sprinkler Co. bids on three to five thousand jobs per year.  It wins, and works on, approximately one thousand jobs per year.  It had average annual revenues of approximately $20 million in the 1990's and average annual revenues of $18 million in the last three years.  It has a customer base of three to five thousand building owners and general contractors.  It has a market presence throughout the mid-Atlantic region.  And, it has relatively constant interaction with vendors and its construction customers.

At trial, Plaintiff put on evidence of several instances of actual confusion occurring within the eight months after Wes Worsham Fire Protection, LLC opened for business.  First, Wes Worsham acknowledged that he had received two phone calls and one facsimile from people who thought Wes Worsham Fire Protection, LLC was the company with which they had dealt in the past, when, in fact, those persons were likely to trying to contact Worsham Sprinkler Co.

In another instance of confusion, James Edmunds, a design manager for Virginia Sprinkler Company, testified that he received a letter from Kenbridge Construction Co. addressed to "Worsham Sprinkler Co., Attn. Jim Edmunds."[10]   The letter contained a

---

[10] Although Virginia Sprinkler Co. is a sister company to Worsham Sprinkler Co., the fact that the letter was addressed to Edmunds at Worsham Sprinkler Co. was not explained at trial.

construction schedule and was addressed to many other subcontractors - electric, plumbing, lighting, climate, etc - on the job.  Neither Virginia Sprinkler Co. nor Worsham Sprinkler Co. was working on the job discussed in the letter.  Instead, it was a job on which Wes Worsham Fire Protection, LLC was working, and the letter originally was type-addressed to Allen Mills, an employee at Wes Worsham Fire Protection, LLC.  Mills' name was crossed out and Edmunds' name had been interlineated in pen.

Testimony at trial by Wayne Taylor, Vice-President of Wes Worsham Fire Protection, LLC, also revealed that Wes Worsham Fire Protection, LLC lost an opportunity to bid on a Garcia Construction project because the plans for the project were inadvertently sent to Worsham Sprinkler Co.

Additionally, Gerard Folio, a project manager for the general contractor Howard Shockey & Sons, testified that, upon seeing a document with Defendant's name at the top, he immediately thought it was from Worsham Sprinkler Co. and did not realize it was from Wes Worsham Fire Protection, LLC until some days later.

Scott Williams, the Richmond Division General Manager of Virginia Sprinkler Company, testified that, on February 10, 2005 when he signed out blue prints from Greybeale Construction to prepare a bid, he noticed an entry that read "Worsham" in the log book.  Upon returning to his office, he discovered that Worsham Sprinkler Co. was not bidding on that project and, therefore, would

not have picked up the blue prints.  Cross examination revealed that Wes Worsham Fire Protection, LLC is located four doors down from Greybeale Construction.  However, there was no evidence about who made the entry or why.

Finally, Defendants' witnesses John Lawson and Mark Greenwald, both executives at large construction firms, testified that they have never been confused by the emergence in the market of Wes Worsham Fire Protection, LLC.  Both men emphasized that it would be important to specify which of the two companies is being referred to in the course of dealing because an error could have commercial consequences if information were disclosed to the wrong company by accident.  When asked what he thinks of when the name "Worsham" is said, Greenwald responded "Which Worsham?. . . We go out of our way to say Wes Worsham Fire Protection, LLC and Worsham Sprinkler Co.." This testimony demonstrated that sophisticated contractor employees--the customer base served by the parties--can easily distinguish between the two companies, are not confused by their existence, but also recognize that confusion, which has the potential to cause harm to commerce, is inherent in the existence of two similarly named, similarly situated companies.

Seven isolated instances of actual confusion do not establish the existence of actual confusion as a factor that weighs in Plaintiff's favor where, as here, the Plaintiff is working on more than 1,000 jobs and is bidding on some 3,000 jobs.  That is

especially true if, as is shown by this record, the customer base is exceptionally sophisticated and the contracting process is sufficiently sophisticated to foreclose most actual confusion. Carefirst of Maryland, Inc. v. First Care, P.C., 350 F. Supp.2d 714, 725 (E.D.Va 2004) ("two people out of 130 indicating actual confusion is de minimis.") aff'd 434 F.3d 263 (4th Cir. 2006); Therma-Scan, 295 F.3d at 635 (six misdirected emails out of more than 11,000 inquiries is de minimis); Petro, 130 F.3d at 95 ("In light of [plaintiff's] huge volume of commerce, [plaintiff's] meager evidence of actual confusion is at best de minimis.").

Furthermore, the few instances of confusion shown by this record could well be the result of carelessness or inattention. As the Sixth Circuit has held, "[t]he owner of a trademark is not entitled to a guarantee against confusion in the minds of careless and indifferent buyers, and merely occasional cases of confusion or thoughtless error by very inattentive purchasers are of very little significance in trademark and unfair competition." S.C. Johnson & Son, Inc. v. Johnson, 266 F.2d 129, 141 (6th Cir. 1959) quoted in Therma-Scan, Inc. v. Thermascan, Inc., 295 F.3d 623, 636 (6th Cir. 2002) (several wrongly addressed emails result of inattentiveness). Likewise, where defendant received plaintiff's mail and several phone calls, the Eighth Circuit held this confusion was de minimis and showed "inattentiveness on the part of the caller or sender

rather than actual confusion."  Duluth News-Tribune v. Mesabi Publ'g Co., 84 F.3d 1093, 1098 (8th Cir. 1996).

Of course, the instances reflected in this record also could be the product of actual confusion in the minds of careful employees in the construction industry.  However, the record proof does not permit a finding to that effect, and the failure of proof on that point must cut against the Plaintiff because it bears the burden of proof.

Although the Fourth Circuit has held that liability in an infringement action turns on likelihood of confusion "among reasonably prudent purchasers," Perini, 915 F.2d at 127, the Perini court also held that "the likelihood of confusion inquiry, when applied to trade names, embraces the public as a whole." Perini, 915 F.2d at 128.  As the Fourth Circuit has explained:

> A trade name symbolizes the reputation of a business. Consumers are interested in the quality and cost of the goods or services that it offers; suppliers are concerned with the prompt payment of bills and credit standing; investors, with financial stability, return and growth; labor, with rates of pay, fringe benefits and personnel policies; and the general public, with management's participation in public affairs. All of these factors, and more, make up the communication mosaic in which a business enterprise must fit and which its trade name reflects. Infringement of a trade name is a tort touching all these factors.

Communications Satellite Corp. v. Comcet, Inc., 429 F.2d 1245, 1250 (4th Cir. 1970) (likelihood of confusion among investors is an adequate predicate for relief) (internal quotations omitted).

Focusing on the Lanham Act's requirement that a plaintiff prove it is "likely to be damaged" by the defendant's actions, 15 U.S.C. 1125(a) (Section 43(a)), the Perini court held that likelihood of confusion may be established among the public if the plaintiff shows that "public confusion will adversely affect the plaintiff's ability to control his reputation among its laborers, lenders, investors, or other group (sic) with whom the plaintiff interacts." Perini, 915 F.2d at 128. Under Section 43(a) and Perini, the plaintiff need not prove that public confusion has caused actual harm, only that there is some likely and identifiable injury that will result from confusion among non-purchasers. Id. ("A trade name infringement case under § 43 of the Lanham Act cannot be made out by merely presuming that the public will be confused without an identification of how the forecasted public confusion will "damage" the plaintiff." Citing 15 U.S.C. § 1125(a)).

Other courts of appeals have also held that, in the trade name context, "actual confusion is commercially relevant if the alleged infringer's use of the mark 'could inflict commercial injury in the form of . . . a diversion of sales, damage to goodwill, or loss of control over reputation' on the trademark holder." Beacon Mut.

44

Ins. Co. v. OneBeacon Ins. Group, 376 F.3d 8, 15 (1st Cir. 2004) (quoting The Sports Authority, Inc. v. Prime Hospitality Corp., 89 F.3d 963 (2d Cir. 1996) and citing Perini, 915 F.2d at 128 (4th Cir.), and cases from the Seventh and Sixth Circuits). This conclusion is supported by noted commentators. Restatement (Third) of Unfair Competition § 20 cmt. b (1995); McCarthy, supra, § 23:7 & n. 12; Callman on Unfair Competition, Trademarks and Monopolies § 21:4 (4th ed. 1981).

Similarly, courts of appeals have held, and have construed Perini also to hold, "that the likelihood of confusion inquiry is not limited to actual or potential purchasers, but also includes others whose confusion threatens the trademark owner's commercial interest in its mark." Beacon, 376 F.3d at 16 (citing cases from the Eighth and Sixth Circuits, U.S. P.T.O Trademark Trial and Appeal Board, and Perini, 915 F.2d at 128 (4th Cir.)).

As the Beacon court explained, because confusion within an entity with multiple employees may have commercial implications apart from purchasing, "[r]elevant confusion among non-purchasers may well extend beyond the confusion of those persons positioned to influence directly the decisions of purchasers." Id. at 16-17. That is, even where the decision-makers in customer or vendor companies are sophisticated or knowledgeable, confusion among other customer or vendor employees is relevant if such confusion is shown likely to cause damage to the senior user's interests. See 15

45

U.S.C. § 1125(a) (making trademark infringement actionable where senior user "is likely to be damaged" by junior user's confusingly similar mark.); <u>Beacon Mut.  Ins.</u>, 376 F.3d at 16-18 (inferring from facts presented the likely harms to the senior user, including as a result of low and mid-level employee confusion); <u>cf.</u> <u>Perini</u>, 915 F.2d at 128 (holding that proof of "forecasted" damage to reputation among "other group[s]" is an actionable predicate to infringement, but holding that no such showing had been made.)

The record establishes a few isolated instances of confusion on the part of the Plaintiff's suppliers.  However, testimony at trial also showed convincingly that Worsham Sprinkler Co.'s reputation among vendors has not changed since Wes Worsham Fire Protection, LLC began business.

In one instance of so-called supplier confusion, Derek Zane, a foreman for Worsham Sprinkler Co., testified that, after picking up from a supplier a specific part needed to complete a job, Zane noticed that the invoice for that part was made out to Wes Worsham Fire Protection, LLC.  He reported this to his supervisor, but he did not know what happened subsequently with the invoice.  The evidence from Zane did not establish how or why the confusion occurred.  Nor did the record show any potential damage flowing from the confusion.  In any event, evidence that one vendor was actually confused about the billing of one part in one job over an eight month period is de minimis given that Plaintiff has

46

approximately one thousand jobs annually that involve countless parts. See Petro, 130 F.3d at 95 ("In light of its huge volume of commerce, [plaintiff's] meager evidence of actual confusion is at best de minimis").

John McNamara, an executive with Reliable Automatic Sprinkler Co., Inc., which is a vendor to both parties in this action, testified that, notwithstanding efforts to make sure that his employees were careful when dealing with or talking about the parties to this suit, a Reliable regional manager recently had told McNamara "that he had called on Worsham," by which the manager meant Wes Worsham Fire Protection, LLC.  McNamara testified that another of Reliable's regional sales managers, an order department employee, and an employee working on computerized customer accounts had all referred to Wes Worsham Fire Protection, LLC as "Worsham." While these employees may have intended to speak about Wes Worsham Fire Protection, LLC, McNamara understood his employees to be talking about Worsham Sprinkler Co. because Worsham Sprinkler Co. has been known in the industry for over thirty years as "Worsham." This evidence demonstrates that, while individuals distinguish between the two parties to this action, the similarity in their trade names has, in limited instances, resulted in actual confusion between what is said and what is meant.

McNamara also testified that, if one company's proprietary information, especially pricing information, was accidentally

disclosed to the other company, the disclosure could cause harm, both in terms of economic harm and harm to the good will of the fire protection company.  For example, if a vendor sold to Worsham Sprinkler Co. at a bulk price advantage and if the vendor, because of internal confusion, sent a copy of the pricing arrangement to Wes Worsham Fire Protection, LLC instead of to Worsham Sprinkler Co., Worsham Sprinkler Co. could be harmed because the price advantage would no longer be confidential and Wes Worsham Fire Protection, LLC might then obtain the same negotiated price.  In that hypothetical case, Wes Worsham Fire Protection, LLC would have achieved a price advantage because of the confusion.  Gaining such an advantage because of a confusingly similar trade name is a type of harm that trademark law, as a species of unfair competition law, seeks to prevent.  See McCarthy, supra, 2:7 (Trademark law is a species of unfair competition law and protects the use of a trademark owner's mark as a means of competing in a fair market).  This hypothetical scenario, however, is conjectural, and McNamara testified that no actual errors had yet occurred. It is true that one of McNamara's employees asked McNamara whether, for group rate pricing purposes, Wes Worsham Fire Protection, LLC, which she referred to as "Worsham," was to be included in the pricing group. And, had McNamara not realized and corrected the confusion and miscommunication, Wes Worsham Fire Protection, LLC might have received the confidential group-rate prices granted to VSC

48

affiliates, including Plaintiff.   That, of course, is itself speculative and, in any event, the employee was sufficiently aware of the difference to inquire of her employer.   That is evidence that no actual confusion occurred, and it tends to prove that mid-level employees in the industry are sufficiently sophisticated to clarify confusion before it causes commercial harm.

Considered as a whole, taking into account the sophistication of the customer base and the suppliers, the few instances of actual confusion must be considered de minimis.   Accordingly, this factor does not support Plaintiff's argument for likelihood of confusion.

### H.   The Applicable "Confusion" Factors As A Whole

After each factor is assessed separately, all are to be weighed, as a whole, together to determine whether Plaintiff has proved a case of infringement. CareFirst, 434 F.3d at 267.   On this record, the Plaintiff has not carried its burden to establish a likelihood of confusion.

The marks, having acquired a secondary meaning, at issue are entitled to protection.   However, the marks are not strong.   The parties offer similar services in the same geographic market in which they advertise similarly.   They operate in essentially the same industry, which, for purposes of a likelihood of confusion analysis, has a sophisticated customer base and a purchasing system that is deliberate, time intensive, and the antithesis of impulse buying.

The names of the parties are similar but are dispositively different in sight and sound and in meaning within the customer base in the relevant market.  There have been a few instances of actual confusion mostly anecdotal in nature and not well-explained.  And, to the extent that the record explains the customers of actual confusion, they are de minimis.  That is especially so considering the extremely large number of jobs on which the parties bid.

Considering the factors and the record, as a whole, the Plaintiff has not established a likelihood of confusion.

**CONCLUSION**

For the foregoing reasons, Plaintiff's prayer for injunctive relief will be denied, judgment will be entered for the Defendants, and the action will be dismissed with prejudice.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.

```
                           /s/
_____
                          Robert E. Payne
                          United States District Judge
```

Richmond, Virginia
Date: March 8, 2006